IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                              CR 11-0614 RB

EDUARDO LOPEZ, JR.,

      Defendant.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Defendant Eduardo Lopez, Jr. is charged with conspiring to distribute fifty or more grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A) and possessing with intent to distribute fifty or more grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A) and 18 U.S.C. § 2. (Doc. 81.) He has filed a Motion to Suppress (Doc. 55), a Motion for a Bill of Particulars (Doc. 89), and a Motion for Production of Alleged Co-Conspirator Statements and Pre-Trial Hearing on their Admissibility (Doc. 90). These motions have been referred to me by United States District Judge Robert C. Brack to make findings of fact and to recommend an ultimate disposition. (Doc. 94; Doc. 85.) A hearing was held on the motions on September 1, 2011, during which Lawrence Archuleta, the arresting officer, and the Defendant testified. (*Id.*)

### MOTION TO SUPPRESS

The charges against Lopez and the other Defendants arose from a traffic stop and subsequent vehicle search that occurred on the afternoon of December 7, 2010. (Doc. 55 at 1; Doc. 72 at 1.) In this motion, Lopez seeks the suppression of all evidence seized on December 7, 2010. He contends that (1) Sergeant Archuleta lacked probable cause to stop the vehicle for speeding; (2) he was not free to leave after the reason for the initial stop had dissipated and the continued encounter was not

1

consensual; (3) Sergeant Archuleta lacked reasonable suspicion to detain him after the reason for the stop was accomplished; (4) if the encounter was consensual, the search exceeded the scope of consent; and (5) his alleged consent was not valid. (Doc. 55 at 4-5.) During the hearing, Lopez also argued that all information gathered from him after Sergeant Archuleta opened the door of the vehicle to inspect the VIN number must be suppressed. (Doc. 123 at 103-04.)

I.     Background

At the hearing on the motions, Sergeant Archuleta and Lopez testified about the stop, the interaction between the officer and the citizens, the continuation of the encounter beyond the purposes of the stop, and the subsequent search. There were many contradictions between Sergeant Archuleta and Lopez's versions of the facts, and the credibility of the witnesses will be discussed below. The following recitation of the facts states the undisputed facts unless otherwise indicated.

Lopez and Jose Jesus Cuellar ("Cuellar") were southbound on Interstate 25, driving Cuellar's sister's 2001 red BMW. Both men had her permission to drive the car. (Doc. 123 at 76.) As they were heading into the City of Las Cruces, they were stopped by Las Cruces Police Department Sergeant Lawrence Archuleta, who was working criminal interdiction on behalf of metro narcotics. (Doc. 55 at 1; Doc. 72 at 1; Doc. 123 at 10-11, 14-15.) Sergeant Archuleta, using a recently tested radar gun, measured the speed of the BMW at seventy-one miles per hour in a sixty-five mile per hour zone. (Doc. 123 at 10-11.) He additionally witnessed the front of the car dip as it approached, which, based on his training and experience, indicated that the driver applied the brakes quickly. (*Id.* at 11.) The BMW pulled over at approximately mile marker 7 without incident. (*Id.* at 9-11.) Mile marker 7 is at the edge of the City of Las Cruces – there is a housing development visible from the highway, which is accessible from the highway if a person were to cross a wall separating the highway from the surrounding area. (*Id.* at 51.)

After pulling the vehicle over, Sergeant Archuleta approached the vehicle on the passenger

side and spoke to the driver, Cuellar, through the open passenger-side window. (Doc. 55 at 1; Doc. 72 at 1; Doc. 123 at 11, 13.) He informed them that he had pulled the vehicle over for speeding. (Doc. 55 at 1-2; Doc. 72 at 1; Doc. 123 at 11, 13.) Sergeant Archuleta collected Cuellar's driver's license and registration and, during this initial encounter, noticed approximately five empty cans of energy drinks on the rear floorboard, a rosary hanging from the rearview mirror, a map between the two front seats, and that the vehicle was not registered to Cuellar. (Doc. 55 at 1-2; Doc. 72 at 2, 13-14.) Sergeant Archuleta testified that those items did not initially arouse suspicion, but that the map and the number of energy drinks seemed odd once he learned that Cuellar, who resides in El Paso, and Lopez were traveling between El Paso and Albuquerque, an approximately three-and-a-half to four hour trip. (Doc. 123 at 18, 53.) He further stated that the rosary aroused suspicion as the stop progressed because his training and experience indicates that contraband couriers often keep religious articles in their vehicles to appear law-abiding and religious, though he also admitted that there is a large Catholic population in the area, many of whom hang rosaries on their rearview mirrors. (*Id.* at 19, 52-53.)

Sergeant Archuleta asked Cuellar to step out of the car and spoke with him while issuing a warning citation for speeding. (Doc. 55 at 2; Doc. 72 at 2; Doc. 123 at 15.) Cuellar stood near the front tire on the passenger side of Sergeant Archuleta's vehicle, and Sergeant Archuleta stood with the passenger door in between the two of them. (Doc. 123 at 15.) During the conversation, Sergeant Archuleta reported that Cuellar said that he and his cousin, the passenger, were traveling from Albuquerque, where they had visited a cousin, to El Paso. (Doc. 55 at 2; Doc. 72 at 2; Doc. 123 at 15.) During the conversation, Sergeant Archuleta determined that the vehicle was registered to Cuellar's sister, that Cuellar's address was the same as that of his sister according to the registration, and that Cuellar reported not knowing how long his sister had owned the vehicle. (Doc. 55 at 2; Doc. 72 at 2; Doc. 123 at 15-16.) Sergeant Archuleta stated that he found this odd because Cuellar was

a young man living at the same address as that on the vehicle registration, the registration was recently renewed, and it was a "pretty nice car." (Doc. 123 at 16; *see also* Doc. 72 at 2.)

Sergeant Archuleta testified to seeing signs of nervousness, including that Cuellar was fidgety, rubbing his face and his nose and repeatedly placing his hands in his pockets despite Sergeant Archuleta telling him not to do so several times, and had an increasingly dry mouth. (Doc. 55 at 2; Doc. 72 at 3; Doc. 123 at 16, 17.) Sergeant Archuleta further stated that an increasingly dry mouth indicates, based on his training and experience, that the person is nervous. (Doc. 123 at 16.) He characterized Cuellar's nervousness as more than the general nervousness any citizen has when pulled over by a police officer, stating that his nervousness continued beyond learning the outcome of the stop, which was unusual. (*Id.* at 17.) However, he also indicated that he does not know Cuellar and is unfamiliar with any of his habits or tics. (*Id.* at 54.)

Sergeant Archuleta then proceeded to the passenger side of the vehicle to compare the VIN number on the car to the registration. (*Id.* at 20.) He went to the driver's side of the vehicle, looked at the VIN number through the windshield, and then opened the door to check the VIN number on the door. (*Id.* at 55.) During this time, he engaged Lopez in conversation about their travel plans. (*Id.* at 20-21.) Lopez confirmed that they had been visiting a cousin in Albuquerque. (Doc. 55 at 2-3; Doc. 123 at 21.) However, he also allegedly stated that they had not been able to contact the cousin when they got to Albuquerque so had spent the night in a hotel and that he did not know how long he had been in Albuquerque. (Doc. 72 at 3; Doc. 123 at 21, 23.) Sergeant Archuleta reported finding those statements very odd and suspicious. (Doc. 123 at 21-23.) He testified that he would expect a person visiting family to contact their family in advance and know where they live, that he found the hotel statement odd because the driver had not mentioned it, and that he would expect someone to know how long he was gone and what he did during the trip. (*Id.* at 22-23.)

Sergeant Archuleta stated that Lopez displayed signs of nervousness including eye contact

4

aversion at times, smoking about three cigarettes during the conversation, and sweating despite the temperature being sixty degrees in December. (Doc. 55 at 3; Doc. 72 at 3; Doc. 123 at 21.) Sergeant Archuleta found the nervous behavior suspicious because, according to him, passengers do not typically feel nervous during a traffic stop, and he characterized Lopez's nervousness as extreme. (Doc. 123 at 21-22.) However, he again admitted that he does not know Lopez and is unfamiliar with any of his personal circumstances. (*Id.* at 56.) Lopez was also drinking an energy drink during the conversation. (*Id.* at 21.) Lopez stated that he had assumed that Cuellar would be getting a ticket and that he was not told that it would only be a warning. (*Id.* at 77.) He said that he was sweating simply because he was hot because he is from Estacada, Oregon. (*Id.* at 89.) He further stated that he is a chain-smoker who smokes two packs of cigarettes each day, though he contended that he only smoked one cigarette during the traffic stop. (*Id.* at 90.)

After the conversation with Lopez, Sergeant Archuleta testified that he "thought that they might be involved in some type of criminal activity . . . ." (*Id.* at 24.) He returned to Cuellar, gave him his documents, handed him a warning citation, and explained it to him. (Doc. 55 at 3; Doc. 72 at 3-4; Doc. 123 at 24.) He asked if Cuellar "had everything and was good to go" and Cuellar began to walk back to his car. (Doc. 55 at 3; Doc. 72 at 4; Doc. 123 at 25.) Sergeant Archuleta then said "Mr. Cuellar" in a conversational tone when Cuellar was ten to twenty feet away, and Cuellar returned to where he had been standing. (Doc. 55 at 3; Doc. 72 at 4; Doc. 123 at 25-26.) Sergeant Archuleta asked Cuellar if they could speak for a bit longer, and Cuellar agreed. (Doc. 55 at 3; Doc. 72 at 4; Doc. 123 at 25.) Sergeant Archuleta stated that he was not preventing Cuellar from leaving when he called out, though he did not tell Cuellar directly that he was free to go. (Doc. 123 at 26, 59-60.) Sergeant Archuleta then asked the same questions again and also asked for additional information about the cousin, learning in part that his name was Gabriel Cuellar. (*Id.*)

Sergeant Archuleta approached the vehicle again to speak with Lopez. He reports that he told

Lopez that he gave Cuellar a warning and that Cuellar was "good to go." (Doc. 55 at 3; Doc. 72 at 4; Doc. 123 at 27, 28.) He did not tell Lopez that he was free to go. (Doc. 123 at 61.) He testified that he asked Lopez if they could talk while no other officers were around and while doing nothing to prevent him from leaving and that Lopez agreed. (Doc. 55 at 3; Doc. 72 at 4; Doc. 123 at 27-28.) Lopez contradicted much of this testimony, stating that he did not know what was going on with Cuellar. (Doc. 123 at 80.) Furthermore, Lopez testified that he did not feel free to leave because Cuellar was his ride and was still waiting on the officer. (*Id.*) He testified that Sergeant Archuleta did not tell him that Cuellar was good to go, and he first admitted that Sergeant Archuleta asked if he could ask further questions but subsequently asserted that Sergeant Archuleta never asked permission to further question him. (*Id.* at 90, 91.)

During the conversation, Sergeant Archuleta identified Lopez by asking for his driver's license, confirmed what Lopez initially told him, and again asked him about his trip. (*Id.* at 29.) Lopez still was unable to state how long he had been in Albuquerque, but eventually told Sergeant Archuleta that he was there for a couple of days. (*Id.*) During this contact, Lopez also indicated that the cousin they visited was female by stating that he did not know her name because she is from a different side of the family. (*Id.*) He continued to assert that he could not remember the name of the cousin during his testimony. (*Id.* at 86.) Sergeant Archuleta reported that his inability to remember her name immediately after visiting her was very suspicious. (Doc. 72 at 4; Doc. 123 at 29.) At this point, Lopez and Cuellar had reported inconsistent information about the gender of their cousin. Lopez's signs of nervousness continued and increased, according to Sergeant Archuleta, including continued smoking, sweating, and a pounding cartoid artery in his neck. (Doc. 72 at 4-5; Doc. 123 at 29.)

Sergeant Archuleta returned to Cuellar and asked for his cousin's telephone number. (Doc. 123 at 30.) Cuellar provided a number with an El Paso area code, and Sergeant Archuleta questioned

6

him about where his cousin lives. (*Id.*) Cuellar dropped his head and did not answer. (*Id.*) Sergeant Archuleta called and spoke to a person with the name given by Cuellar, but the person advised that he was Cuellar's brother and that Cuellar was returning from Phoenix. (Doc. 55 at 3-4; Doc. 72 at 5; Doc. 123 at 31.) Sergeant Archuleta concluded that Cuellar and Lopez had been lying to him. (Doc. 123 at 31.)

Sergeant Archuleta asked both Cuellar and Lopez if he could search the vehicle, both allegedly consented, and both signed a form that provided in part that "if the search reveals a false or altered compartment, access of such compartment will be made by any means available; including drilling and/or cutting of compartment." (Doc. 72 at 5-6; Doc. 123 at 31-35.) Prior to the initiation of the search, Sergeant Archuleta asked each individual if he was responsible for everything in the car; Cuellar responded in the affirmative but Lopez stated that he was only responsible for a few bags in the backseat. (Doc. 72 at 5-6; Doc. 123 at 32-35.) Lopez testified that he did not consent to a search of the car but simply to a search of his belongings. (Doc. 123 at 80-81.) He also stated that, though he signed the form, he did not read it. (*Id.* at 80.)

Before the search began, Sergeant Archuleta directed Lopez and Cuellar to stand approximately 120 feet away from the vehicle. (*Id.* at 32-35.) Sergeant Archuleta asserted that this was for his safety because he was the only officer there at the time. (*Id.* at 35.) Lopez testified that Sergeant Archuleta had them keep walking even though they tried to stop just in front of the BMW. (*Id.* at 81.) He also testified that he told Sergeant Archuleta that he needed to use the restroom, and that the officer told him to keep walking until reaching a bush that he could hide behind. (*Id.*) They purportedly found such a bush approximately 150-160 feet away. (*Id.*) Sergeant Archuleta did not remember this request. (*Id.* at 73.) Though Lopez did not mention it when initially discussing walking away from the car, on cross-examination he stated that Sergeant Archuleta told them to walk away and said, "Keep walking and don't move from there." (*Id.* at 95.) Sergeant Archuleta

denied that he made such a statement. (*Id.* at 99.)

In the search, Sergeant Archuleta found receipts from several states within several days of the stop, tool markings on the rear speakers, a necklace medallion of Jesus Malverde upon removing the speaker, and a "hidden aftermarket compartment between the backseats and the trunk." (Doc. 72 at 6; *see also* Doc. 123 at 35-40.) Sergeant Archuleta, based on training and experience, knew that Jesus Malverde is the patron saint of drug traffickers. (Doc. 123 at 37.) After he located the compartment, Sergeant Archuleta acknowledged that several officers came to the scene. (*Id.* at 69-70.) Sergeant Archuleta pried the metal door of the hidden compartment back and forcibly opened the door in order to access the compartment, in which he found 522.3 grams of methamphetamine. (Doc. 72 at 6; Doc. 123 at 39-41.) Though Sergeant Archuleta did not mention any destruction to the vehicle other than prying open the materials in the backseat and removing a speaker, Lopez claimed that during the search he saw the "backseat fly out the door." (Doc. 123 at 85.)

Lopez contends that other officers, both in uniform and not in uniform, were present before the search began.(Doc. 55 at 4; Doc. 123 at 82-84.) He stated that, when he signed the consent form, there was a heavier-set caucasian male standing behind him, a woman on the scene who he could not see, and at least two other police cars. (Doc. 123 at 82-83.) He also testified that there were other officers on the scene as they walked away from the car as directed and that, during the search, they were not allowed to return to the car because a female officer told them not to. (*Id.* at 83-84.) Lopez claimed that, at one point, he asked to return to the car to get his cigarettes and the female officer told him that he could not and that he needed to stay where he was. (*Id.* at 84.) Sergeant Archuleta admitted that some Border Patrol agents were on scene after the search began but before the compartment was found, and then that several officers arrived on the scene after he located the compartment. (*Id.* at 69-71.) He also stated that some of these officers were likely keeping an eye on Cuellar and Lopez. (*Id.* at 73.)

8

Sergeant Archuleta initiated the traffic stop around 2:15 p.m. He testified that he gave Cuellar the citation at approximately 2:35 p.m. (*Id.* at 63.) Cuellar signed the consent to search form at 2:43 p.m. (*Id.* at 68.) Sergeant Archuleta located the compartment at approximately 3:45 p.m. and remained at the scene of this stop, search, and arrest until approximately 7:00 p.m. (*Id.* at 50, 69.)

## II.    *Factual Findings as to Credibility*

Lopez and Sergeant Archuleta told frequently inconsistent versions of the facts surrounding the stop. While I do not believe that either was lying to the Court, it did appear that Lopez exaggerated his experiences. His story was inconsistent at times. For example, on direct examination, Lopez stated that he could see a housing development from the interstate and that it was "a real nice-looking neighborhood." (Doc. 123 at 82.) On cross examination, Lopez acknowledged that there were houses around, but that "they looked pretty bad. They looked like a deserted town. . . . It looked like cookie-cutter houses." (*Id.* at 94.) When asked about whether he was allowed to return to the car during the search on direct examination, he indicated that he was not because a female officer told him to stay where he was. (*Id.* at 84.) However, on cross-examination, he stated for the first time that, in addition to the female officer, Sergeant Archuleta told him not to move from where he was standing. (*Id.* at 95.) As another example, Lopez stated that he is a chain-smoker, smoking two packs of cigarettes a day, but attempted to contradict Sergeant Archuleta by stating that he only smoked one cigarette during their encounter. (*Id.* at 90.) Those statements are contradictory. While an addict would certainly remember being prevented from smoking, Lopez had full access to his pack of cigarettes while in the car talking to Sergeant Archuleta. Thus, I find it hard to believe that a chain smoker would clearly remember the exact number of cigarettes smoked during an event nine months ago.

In addition to contradictions, Lopez's testimony was clearly exaggerated on some topics including his description of the weather. He acknowledged that he is from Estacada, Oregon and

described the temperature there as thirty degrees or lower in December with two to three feet of snow. (*Id.* at 89.) On that basis, he claimed that he was "really hot" in the sixty degree weather in Las Cruces in December. (*Id.* at 93-94.) It is appropriate here to take judicial notice of the fact that Estacada is in close proximity to Portland, Oregon, which is in a region known for its temperate climate and mild, damp winters. *See Rio Grande Silvery Minnow v. Keys*, 469 F.Supp.2d 973, 988 (D.N.M. 2002) (taking judicial notice of the dry weather in the Rio Grande watershed), *vacated on other grounds*, 601 F.3d 1096 (10th Cir. 2010); National Oceanic and Atmospheric Administration, *Climatography of the United States No. 20: 1971-2000*, Station: Portland International Airport (February 2004).

Accordingly, I find that Lopez exaggerated his testimony when he felt that doing so would be to his benefit. Thus, I find him to be less credible in his version of events than Sergeant Archuleta.

III.    *Discussion*

   A.    **Standing to Challenge Search and Seizure**

Because a traffic stop is considered a seizure of all persons in the vehicle, the passenger and the driver have standing to challenge the validity of the stop. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Gama-Bastidas*, 142 F.3d 1233 (10th Cir. 1998). Challenging a search, though, requires that the individual have some personal expectation of privacy. *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000). Lopez asserts that he has standing to contest the search because he was an occupant in the car at the time of the stop. (Doc. 55 at 5 (citing *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164 (10th Cir. 1995)).) He contends that because he was in lawful possession of the vehicle, he had an expectation of privacy in the vehicle. (Doc. 110 at 2.) However, if he lacks standing to contest the search, Lopez may still seek suppression of evidence found as a result of his detention. *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).

The United States does not challenge Lopez's standing to contest either the seizure or the search. Standing is not a jurisdictional issue. *Id.* at 1135. Thus, though the party moving for suppression bears the burden of establishing his or her standing, the government waives the issue if it is not raised. *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995) (quotation omitted); *United States v. Dewitt*, 946 F.2d 1497, 1499–1500 (10th Cir. 1991). Because the government has not questioned Lopez's standing, I find that it has waived the issue.

### B.        Reasonable, Articulable Suspicion for Stop

Lopez contends that the traffic stop was conducted for reasons other than those asserted by Sergeant Archuleta. (Doc. 55 at 6.) Relying on *United States v. Botero-Ospina*, 71 F.3d 783, 786-87 (10th Cir. 1995), Lopez argues that the asserted legal justification was pretext for an unrelated suspicion, which means that the stop was not justified at its inception and violated the Fourth Amendment. (Doc. 55 at 6.) The United States contends that the initial stop was based on a reasonable, articulable suspicion that the vehicle was speeding, and so the stop was justified at its inception. (Doc. 72 at 7-8.)

A traffic stop, like an investigatory detention, is a seizure within the meaning of the Fourth Amendment. *Botero-Ospina*, 71 F.3d at 786 (citing *Prouse*, 440 U.S. at 653). Thus, a traffic stop must be reasonable, which means that the officer's action must be justified at its inception and reasonably related to the circumstances justifying the stop. *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). "[A] traffic stop is valid under the Fourth Amendment [at its inception] if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Id.* at 787. The officer's actual motives are irrelevant so long as the stop was objectively valid and the scope was confined to achieve the legitimate purpose of the stop. *United States v. Wilkinson*, 633 F.3d 938, 941 (10th Cir. 2011) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Winder*, 557 F.3d

11

1129, 1134 (10th Cir. 2009)). If, however, the officer had no reasonable suspicion that the suspect committed a violation, the stop is unreasonable and any fruits thereof that are not sufficiently detached from the illegality must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

Here, Sergeant Archuleta measured the speed of the BMW at six miles per hour over the speed limit. He witnessed additional evidence of speeding, based on his training and experience, when he saw the front of the car drop indicating that the driver braked. Even if the BMW was not actually speeding, as Lopez claimed, Sergeant Archuleta had an objective basis upon which to believe that a traffic violation had occurred. Thus, the stop was valid at its inception.

### C.    VIN Inspection

Sergeant Archuleta testified that he inspected the VIN number through the windshield and by opening the driver's side door. He stated that he did this because the registered owner was not present, and he wanted to insure that the vehicle was properly identified and that the VIN had not been tampered with. (Doc. 123 at 20.) Lopez contends that this constituted an unconstitutional intrusion into the passenger compartment of the vehicle warranting the suppression of all information gathered from him and against him after that point. Lopez relies on *United States v. Caro*, 248 F.3d 1240 (10th Cir. 2001), a case in which the Tenth Circuit held that, when an officer first checked the VIN through the windshield and then continued the detention in order to open the driver's door and check the VIN, the officer exceeded the permissible scope of the detention. (*Id.* at 1242-43, 1246-47.)

While *Caro* does indicate that Sergeant Archuleta impermissibly extended the conversation with Lopez by checking the VIN first through the windshield and then in the door, the holding of *Caro* has since been expressly limited. In *United States v. Chavira*, 467 F.3d 1286 (10th Cir. 2006), the Tenth Circuit faced a similar factual scenario: the officer made a traffic stop and checked the

VIN on the dashboard and in the doorjamb without the driver's permission. *Id.* at 1288. The Tenth Circuit expressly held that *Caro* only applies when "(1) the officer has verified the dashboard or doorjamb VIN from outside the passenger compartment and (2) the officer nevertheless physically enters the passenger compartment to check the VIN." *Id.* at 1289 n.1. Thus, "[t]here is no unlawful detention under *Caro* if the officer remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both." *Id.*

Here, Sergeant Archuleta did not testify that he entered the passenger compartment; rather, he stated simply that he opened the driver's side door to inspect the VIN. There is no evidence that he entered the passenger compartment. It is notable that Sergeant Archuleta stated a reason for verifying the VIN in that manner. (Doc. 123 at 20.) Accordingly, pursuant to *Chavira*, Sergeant Archuleta did not violate the Fourth Amendment by opening the door and the information garnered from Lopez during the first conversation with Sergeant Archuleta is not subject to exclusion.

### D.  Reasonable Suspicion for Continued Detention

Lopez next argues that the continued detention after Sergeant Archuleta issued the warning citation was in violation of the Fourth Amendment because the totality of the circumstances did not reasonably indicate that criminal activity was afoot. (Doc. 55 at 7-8.) He asserts that his report of his travel plans was consistent with that of Cuellar and that the only support for reasonable suspicion was their nervousness and Sergeant Archuleta's inchoate suspicion. (*Id.* at 7-10.) The government asserts that Sergeant Archuleta had the following factors supporting his reasonable suspicion: (1) Lopez not recalling how long he had been in Albuquerque, (2) inconsistent reports of where they had stayed in Albuquerque, (3) the vehicle's owner was not present, and (4) extreme nervousness on the part of both Cuellar and Lopez. (Doc. 72 at 12-13.)

In order to detain an individual after the purpose of the traffic stop is complete, an officer must either have the individual's consent or reasonable suspicion of wrongdoing. *United States v.*

*Wood*, 106 F.3d 942, 946 (10th Cir. 1997) (quotation omitted). An officer has a reasonable suspicion if he has a particularized and objective basis for suspecting that the specific person is involved in criminal activity. *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009). To determine whether the officer has a reasonable suspicion, the court must consider the totality of the circumstances known to the officer at that time and must accord the officer appropriate deference in his ability to distinguish between innocent and suspicious actions. *Id.*; *United States v. Marquez-Diaz*, 325 F. App'x 637, 643-44 (10th Cir. 2009) (citations omitted). While the nervousness of one person who was previously unknown to the officer is generally insufficient to generate a reasonable suspicion on its own, *Wood*, 106 F.3d at 948; *United States v. Hall*, 978 F.2d 616, 621 (10th Cir. 1992), each factor noticed by Sergeant Archuleta has been recognized by the Tenth Circuit as a factor supporting reasonable suspicion. *United States v. White*, 584 F.3d 935, 950-51 (10th Cir. 2009) (extreme nervousness); *United States v. Olivares-Campos*, 276 F. App'x 816, 821 (10th Cir. 2008) (unpublished) (absent vehicle owner without details about the owner); *United States v. Santos*, 403 F.3d 1120, 1127, 1130-31 (10th Cir. 2005) (implausible, vague and inconsistent travel plans).

Looking at the whole picture in this case, the following factors contributed to Sergeant Archuleta's reason for continued detention: (1) the apparent nervousness of both Cuellar and Lopez, (2) the fact that the car was registered to Cuellar's sister, who was not in the vehicle, (3) Cuellar's statement that he did not know how long she had owned the car, despite residing at the address where she registered the car, (4) Cuellar's statement that they were in Albuquerque visiting a cousin contrasted with Lopez's statement that, though they went to Albuquerque to visit a cousin, they could not reach the cousin and so stayed in a hotel, and (5) Lopez's evasive answer that he did not know how long he had been in Albuquerque.

Nervousness is a factor that may be taken into consideration by a police officer in developing a reasonable suspicion, although the Tenth Circuit has expressed concern about reliance on

14

nervousness where it is a single person with whom the officer has no prior experience. *See United States v. Simpson*, 609 F.3d 1140, 1147-48 (10th Cir. 2010); *Wood*, 106 F.3d at 948 (quoting *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994)). However, an officer need not ignore nervousness, particularly where nervousness is extreme. *United States v. Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011); *United States v. Davis*, 636 F.3d 1281, 1291-92 (10th Cir. 2011). Lopez attempted to explain away what Sergeant Archuleta construed as nervousness on his part. He explained a reason for his sweating and stated that he only had one cigarette. However, I have previously found that Lopez exaggerated his testimony. Moreover, an officer need only base his determination on the circumstances known to him at that time, and Lopez's excessive sweating appeared to Sergeant Archuleta to be caused by nervousness rather than temperature. Finally, while Lopez attempted to account for his nervous behavior, he cannot explain away the nervous behavior of Cuellar. I find that both Cuellar and Lopez were, to an objective observer, exhibiting signs of nervousness throughout the initial interaction and that Cuellar's nervousness was extreme. This factor supports a finding of reasonable suspicion, and because both the driver and the passenger showed signs of nervousness, it weighs more heavily in the reasonable suspicion calculus than it might otherwise.

Inconsistent and evasive answers certainly play a role in the determination of reasonable suspicion, as do bizarre travel plans. *Id.*; *Simpson*, 609 F.3d at 1150-52 (citing *United States v. White*, 584 F.3d 935, 942-43, 951 (10th Cir. 2009); *United States v. Santos*, 403 F.3d 1120, 1130 (10th Cir. 2005); *United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995)). At this point in the detention, the information provided by Cuellar and Lopez was not necessarily inconsistent. However, Lopez's statement that they stayed in a hotel, unmentioned by Cuellar, justifiably raised suspicion given their claim that they went to visit family. Cuellar's statement that he did not know how long his sister owned the vehicle seemed evasive to the officer given their apparently shared

residence. Furthermore, Lopez's response that he did not know how long they had been in Albuquerque was extremely evasive given that they were just returning from the trip. I find that these responses were evasive and vague. The answers gave Sergeant Archuleta a basis upon which to believe that Lopez and Cuellar were fabricating a story about a trip to Albuquerque on the spot. These three separate evasive and suspicion-arousing responses properly contributed to the development of a reasonable suspicion.

Finally, the Tenth Circuit has consistently held that the fact that the vehicle is registered to or was rented by a third party who is not present is a relevant factor contributing to reasonable suspicion. *Ludwig*, 641 F.3d at 1249 (citing *Olivares-Campos*, 276 F. App'x at 821; *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991)). It typically does not matter whether or not the occupants can provide information about the registered owner. *Id.* (citation omitted). In this case, though, this factor has less weight. Cullar was driving his sister's car, and the vehicle was registered to his address. The close relationship between the driver and the car's owner mitigates much of the suspicion that could arise when the registered owner is not present.

Despite giving less weight to the fact that the registered owner was not present, there are several factors that contributed strongly to Sergeant Archuleta's suspicion that Cuellar and Lopez were involved in criminal activity. Accordingly, I find that Sergeant Archuleta had reasonable suspicion to continue the detention in order to dispel his suspicions of criminal activity.

### D.    Consent for Continued Detention

Lopez also argues that his detention after the completion of the purpose of the stop was not consensual. (Doc. 55 at 10-13.) Because Sergeant Archuleta had validly developed a reasonable suspicion to continue the detention, whether the continued encounter was consensual is irrelevant. Accordingly, I will not evaluate whether Lopez consented to the continued detention.

E.       **Consent to Search**

Lopez contends that Sergeant Archuleta's actions in the search of the vehicle, which included dismantling the speakers and drilling and cutting into the panels and backseat, exceeded the scope of his consent. (Doc. 55 at 18-19; Doc. 110 at 8.) Furthermore, though Lopez and Cuellar signed consent to search forms, Lopez argues that Sergeant Archuleta removed his ability to revoke consent by moving him approximately 120 feet from the vehicle. (Doc. 55 at 13.) However, Lopez also contends that he was merely responsible for a few bags in the car, while Cuellar assumed responsibility for the entire car. Thus, though the government waived the issue of standing, there is a logical disconnect in Lopez's arguments. Regardless of this disconnect, because Lopez cannot challenge the scope of Cuellar's consent and because Cuellar did consent to the search of the car including accessing a hidden compartment by any means, the evidence found in the car is admissible.

It is a general rule that an individual may only challenge violations of his own constitutional rights. *McGowan v. State of Maryland*, 366 U.S. 420, 429 (1961). In this case, Cuellar and Lopez were both subject to detention and both signed consent to search forms. Cuellar took responsibility for the entire car and signed the consent to search form. Lopez, the passenger, cannot challenge the fruits of the search since consent was given by Cuellar, the driver of the car. *United States v. Hernandez-Dominguez*, 1 F. App'x 827, 832-33 (10th Cir. 2001) (unpublished) (citations omitted); *see also United States v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999) (citing *United States v. Dunkley*, 911 F.2d 522, 525 (11th Cir. 1990)) (holding that an automobile search is valid if either the driver or passenger with authority voluntarily consented). Lopez cannot challenge the voluntariness or scope of Cuellar's consent because he cannot challenge an alleged violation of Cuellar's rights. Thus, the evidence is not subject to suppression because it was seized in accordance with the consent of Cuellar.

17

For the above reasons, I conclude that the stop, detention, and search were justified. Accordingly, I recommend that Lopez's Motion to Suppress be denied.

### MOTION FOR BILL OF PARTICULARS

Lopez requests that the Court order the United States to provide a bill of particulars setting out his purported involvement in the alleged conspiracy to distribute methamphetamine. (Doc. 89.) He asserts that the indictment does not identify the exact methods utilized by Lopez to conspire to distribute methamphetamine or the exact dates of his involvement. (*Id.* at 1-2.) The government contends that the Superseding Indictment alleges that Lopez participated in a conspiracy from September 1, 2010 to December 7, 2010 and that the allegations have been supplemented by over 300 pages of discovery including synopses of interviews that describe Lopez's involvement. (Doc. 102 at 1.) It states that a bill of particulars is not warranted here because Count I of the Superseding Indictment tracks the language of the statute, names one of the co-conspirators, names the substance involved, and defines the dates and places of illegal activity. (*Id.* at 3.)

Under Federal Rule of Criminal Procedure 7(f), a court may direct the government to file a bill of particulars to supplement the indictment. A bill of particulars may be required where the indictment fails to advise the defendant of the charge with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy if later prosecuted for the same offense. *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996); *United States v. Dunn*, 841 F.2d 1026, 1029; *United States v. Lujan*, 530 F. Supp. 2d 1224, 1242 (D.N.M. 2008) (quotation omitted). Lopez argues that he "is entitled to a bill of particulars in order to achieve a general understanding of the basis for his alleged participation in the conspiracy and the evidence against him." (Doc. 89 at 3-4.) He asserts that the discovery provided fails to disclose the dates, locations and acts comprising Lopez's involvement in the alleged conspiracy, which allegedly lasted three months. (Doc. 89 at 4.)

18

However, a bill of particulars "is not a discovery device." *Lujan*, 530 F. Supp. 2d at 1242 (citing *Dunn*, 841 F.2d at 1029). While a defendant is entitled to be aware of the government's general theory of the case, he is not entitled to notice of all evidence that the government intends to use against him. *Id.* (citation omitted). Thus, so long as the indictment sets forth the elements of the crime charged and enables him to prepare for trial by sufficiently apprising him of the charges, no bill of particulars is required. *Id.* (citing *United States v. Levine*, 983 F.2d 165, 167 (10th Cir. 1992)). Courts have broad discretion in determining whether to require a bill of particulars. *Id.* (citing *Will v. United States*, 389 U.S. 90, 99 (1967)).

Here, Count I of the Superseding Indictment tracks the language of the statute Lopez is charged with violating. It further states the dates of his alleged participation (September through December 7, 2010), names one co-conspirator (Elizabeth Cuellar), and identifies the drug and amount at issue (fifty grams and more of methamphetamine). (Doc. 82 at 1.) In addition, the government has provided Lopez with a large amount of discovery well in advance of trial, including synopses of witness interviews, as well as a detailed list of anticipated co-conspirator statements. (*See* Doc. 102 at 1; Doc. 103 at 2-4.) Based on these facts, it does not seem that a bill of particulars is required to allow Lopez to prepare his defense, to minimize surprise at trial, or to enable him to plead double jeopardy in the future. The government's theory of the case is clear from the Superseding Indictment and its responses to defense motions.

Accordingly, I recommend that Lopez's Motion for a Bill of Particulars be denied.

### MOTION FOR CO-CONSPIRATOR STATEMENTS AND PRE-TRIAL HEARING

Lopez requested the production of alleged co-conspirator statements and a pre-trial hearing on their admissibility pursuant to *United States v. James*, 590 F.2d 575 (5th Cir. 1979). (Doc. 90.) In response, the United States provided a good-faith summary of the anticipated testimony that the government intends to introduce under Federal Rule of Evidence 801(d)(2)(E), though they stated

that they may introduce more statements if any are learned of as it prepares for trial. (Doc. 103 at 1-4; 2 n.1.) At the hearing, Lopez did not want to proceed with a hearing on this Motion because he wanted to review the statements provided by the government in more detail. (Doc. 123 at 103.) He stated that he might not object to the statements and requested the opportunity to file specific objections, if any, to the statements. (*Id.*) I set a deadline for those objections, and Lopez was to identify specific objections, if any, two weeks from the date of the hearing, or by September 14, 2011. (*Id.* at 105.) To date, Lopez has not filed objections. Accordingly, I find that Lopez has conceded this Motion and that it should be denied.

## RECOMMENDATION

I find that the stop of the vehicle in which Lopez was riding was valid, that the continued detention after the conclusion of the purpose of the stop was supported by a reasonable suspicion, and that the search of the vehicle was completed with the consent of the driver. I further find that the Superseding Indictment is sufficiently specific to advise Lopez of the charges against him. Finally, I find that Lopez has conceded his Motion requesting the production of alleged co-conspirator statements and a hearing on their admissibility.

IT IS THEREFORE RECOMMENDED that Lopez's Motion to Suppress (Doc. 55), Motion for a Bill of Particulars (Doc. 89), and Motion for Production of Alleged Co-Conspirator Statements and Pre-Trial Hearing on their Admissibility (Doc. 90) be **DENIED**.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

---

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.                21